**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5917-17T2

PRISCILLA ROBINSON,

     Petitioner-Appellant,

v.

UNITED AIRLINES,

     Respondent-Respondent.

_____

Submitted May 1, 2019 – Decided September 18, 2019

Before Judges Nugent and Mawla.

On appeal from the Department of Labor and Workforce Development, Division of Workers' Compensation, Claim Petition No. 2017-5603.

Kotlar, Hernandez & Cohen, LLC, attorneys for appellant (Matthew J. Solin and Erika M. Page, on the briefs).

Capehart & Scatchard, PA, attorneys for respondent (Prudence M. Higbee, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

In this workers' compensation action, petitioner, Priscilla Robinson, appeals from an order that denied her motion for medical and temporary disability benefits. Petitioner claimed that while undergoing authorized therapy for a fractured wrist that arose out of and in the course of her employment, she either tore the rotator cuff in her left arm or aggravated an existing tear, and now requires surgery. Respondent, United Airlines, disputed the injury arose out of her employment. Respondent contended petitioner's injury existed before she started her therapy and was neither caused nor aggravated by the therapy. The judge of compensation (JOC) determined petitioner had not carried her burden of proving her claim was compensable and denied the claim. For the reasons that follow, we affirm.

I.

A.

Petitioner filed a claim petition in which she alleged she sustained an injury to her left shoulder on June 15, 2016, while undergoing authorized therapy for a previous work injury. The following month, respondent filed an answer to the claim petition and admitted petitioner's shoulder injury arose out of and in the course of her employment. After receiving additional information concerning petitioner's injury, respondent filed an amended answer to the claim

2

petition and denied that petitioner's injury arose out of and in the course of her employment.

In view of respondent's amended claim petition and denial that petitioner's injury was compensable, petitioner filed a Notice of Motion for Temporary and Medical Benefits. The hearing on petitioner's motion took place on four nonconsecutive days from December 2017 through May 2018. Following written submissions, the JOC denied petitioner's motion. This appeal followed.

B.

The parties presented the following evidence during the hearing on petitioner's motion for temporary and medical benefits. Petitioner had been employed by respondent for thirty-two years as a flight attendant when she sustained an injury to her right wrist during the course of her employment in March 2016. Respondent authorized three phases of treatment for petitioner's wrist injury: casting and medical treatment necessary for the injury to heal; occupational therapy; and physical therapy to condition her to return to work. Petitioner completed the first two phases without incident. She began the third phase, work conditioning, on June 15, 2016. She contended she sustained or aggravated her left shoulder injury that day.

3

Petitioner and the therapist who oversaw the therapy gave conflicting testimony about what happened. According to petitioner, on June 15, 2016, her first day of work-conditioning therapy, the therapist made her do several exercises in sets of ten. For the first exercise, the therapist put weights in buckets and petitioner had to walk from one end of the room to the other carrying both buckets. When she finished that set of ten, she worked on what she described as a lift-up machine, in which she would lift a bar to approximately eye level. Last, she did ten sets of exercise requiring her to push against a wall, followed by an exercise where she lifted her arms and brought them back.

Plaintiff did not feel well at the completion of these exercises, though she could not pinpoint the precise problem. She had shortness of breath and palpitations. The upper part of her body "didn't feel right." Nonetheless, she began to ride a stationary bike but could not complete the scheduled fifteen minutes. She stopped after nine or ten minutes.

Petitioner left therapy without complaining about any shoulder pain. Once home, however, she experienced pain in her left shoulder which became worse during the course of the afternoon. The next day, she saw her primary physician, who wrote a letter to the therapist. According to petitioner, her

4

physician advised the therapist "to hold off on the work conditioning until we got the results back from the X-ray and the MRI."

The physical therapist testified for respondent and contradicted petitioner's testimony. The therapist was a sixteen-year employee of the outpatient rehabilitation facility that petitioner attended. She testified that when petitioner appeared on June 15, 2016, for her first work conditioning session, she started the session with pre-conditioning exercises. The pre-conditioning exercises were all stretching exercises. Seven involved the lower extremities, waist, and lower back. The eighth was a combination shoulder-chest exercise where one stretched the chest muscles by pinching the shoulder blades together and then relaxing. Petitioner had no complaints concerning her shoulder during the stretching exercises. Had she so complained, the therapist would have made an entry in her notes. Petitioner also did some cardio training—seven minutes on an upright, recumbent bike.

Petitioner reported feeling heart palpitations and weight on her chest. The therapist offered to take petitioner's vital signs, that is, petitioner's blood pressure and heart rate, or call 9-1-1. Petitioner declined. The therapist reviewed some home exercises with petitioner, and petitioner said she would see

her doctor the next day. The therapist told petitioner to obtain clearance to resume work conditioning.

Petitioner returned two days later, on June 17, 2016, with a physician's note. The physician's note said petitioner had reported severe left shoulder pain. Pending an MRI, she was to do therapy for her right wrist only. Petitioner was also scheduled to see a cardiologist. In view of the note, the therapist modified the Baltimore Therapeutic Equipment machine—a machine that simulated workplace activities—to restrict exercises to petitioner's right hand and right uppers only. The therapist noted petitioner had no complaints of pain that day.

Petitioner next returned on June 20, 2016. She had no complaints of pain and no complaints of cardiac issues. That day, petitioner did one exercise where she used both arms: the push-pull cart, which simulated pushing a beverage cart. Typically, a clinic patient pushes the cart for approximately 200 feet. That was the only exercise petitioner did with both hands; she did the other exercises with her right hand.

Petitioner's medical expert, Craig H. Rosen, an orthopedic surgeon, examined petitioner on January 11, 2018. He reviewed her medical records, including a June 22, 2016 MRI, which revealed a torn rotator cuff in petitioner's left shoulder. Dr. Rosen diagnosed petitioner with a left rotator cuff tear and

recommended that she undergo arthroscopic surgery to repair the torn rotator cuff. Post-surgical care would include physical therapy for two or three months.

Concerning causation, Dr. Rosen expressed the following opinion:

> Either the injury occurred at the time of her physical therapy session on June 15, 2016, with the maneuvers that she was doing, and she described lifting some kind of bar and getting in some kind of swimming motion, and, therefore, that would make the tear directly related to that episode or that incident. The other alternative is that she could have had a pre-existent tear on her shoulder that was quiescent, asymptomatic, and that this was a precipitating event that made her symptomatic and aggravated the underlying problem that she did not know about.

Dr. Rosen explained that because the muscles going into the rotator cuff were not atrophied and had no fatty infiltration, "this is not a longstanding chronic tear." If the tear was longstanding, the MRI would show some evidence of muscle atrophy or fatty infiltration. Generally, it takes two or three years for fatty infiltrates to develop.

Dr. Rosen repeated that from the MRI, he could not say whether this was an old tear or a new tear. The MRI showed the tendon was torn off at the surface, but the doctor did not "know the age of that." He further explained: "it's a large enough tear, it will move immediately a bit, but it is not a chronic retracted tear to the left of the glenoid or the dish in the shoulder that would indicate that this

A-5917-17T2

is being [sic] there for any long period of time." With a large tear, over time, there would be some "retraction of the tendon and atrophy of the muscles, but that takes time to develop."

Dr. Rosen reiterated that petitioner told him she was lifting some type of bar and going through a swimming type of motion during her work conditioning. He elaborated:

> If I'm understanding her correctly, and I'm just going on her telling me what the - - if she was lifting something heavy, a bar that went up at least to shoulder level and higher, and doing some type of motion with her arm out in that position, it is possible to tear a rotator cuff. If you take a [two] or [three]-pound weight, and put it in your hand, when you hold it out straight, you now multiply that, if you go through the physics and biomechanics of it, you've now multiplied that weight many, many times, by the lever of your arm, so a [two] or [three] pound weight may be [fifteen] or [twenty] pounds or more. I didn't do the analysis right off the top of my head here, but a small weight can place much, much greater stress on the shoulder, if the arm is out extended.

During cross-examination, Dr. Rosen said petitioner told him "she was holding onto a bar, and she had to lift her arm up in a swimming-type motion." She said nothing more specific concerning the movement of her arms, other than that "it was a swimming-type motion." In the history he recorded, Dr. Rosen ascribed the following statement to petitioner: "[w]ell, my initial note said . . .

'she says, at that point, according to myself, she was lifting a bar, doing a swim-type exercise, and noted the onset of pain in her left shoulder.'" Dr. Rosen added that if she was lifting the bar from shoulder to eye level, the exercise could cause a rotator cuff tear provided there was enough weight and stress. He could not quantify the amount of weight necessary,

Respondent's evaluating physician, Kenneth A. Levitsky, also an orthopedic surgeon, disagreed that petitioner's left rotator cuff tear was caused or exacerbated by her work conditioning therapy. Dr. Levitsky explained that the most likely mechanism of injury for a rotator cuff tear would be an extension or abduction stretch-type injury with the arm overhead. Other causes could be "a very, very forceful twisting injury perhaps, but to a lesser likelihood, perhaps with the arm below the shoulder blade." The doctor opined that leaning against a wall was an unlikely cause of a rotator cuff tear. He found leaning against a wall to be an unlikely cause because "to tear a rotator cuff acutely it requires a significant amount of force and it requires the right mechanism, and simply leaning against the wall in my opinion, . . . isn't a plausible or a mechanism that would cause a rotator cuff tear."

Shown a list of the preconditioning exercises petitioner performed on June 15, 2016, Dr. Levitsky opined that none of the exercises would cause a rotator

cuff tear. None, he said, were forceful enough and none fit the classic mechanism of injury. He added, "[t]here's no exercise here that demonstrates or would cause a significant twisting force on the shoulder with the arm in an unusual position."

Dr. Levitsky examined petitioner on July 24, 2016. He also took a history and reviewed her medical records, including the June 2016 MRI study. Based on the history petitioner gave him, his review of medical records including the diagnostic studies, and his clinical examination of petitioner, Dr. Levitsky concluded the rotator cuff tear "was likely in my opinion to be a pre-existing tear and was not causally related from the occurrence that was a self-described stretching and pushing exercise against the wall." The doctor reiterated that the exercise plaintiff did on her first day of work conditioning was not a sufficient mechanism of injury to cause a rotator cuff tear.

Dr. Levitsky also read the testimony given by petitioner, the therapist, and Dr. Rosen. Citing the therapist's testimony that petitioner only performed stretching exercises on her first day of work conditioning, and never complained of pain, Dr. Levitsky said the therapist's testimony confirmed his opinion. Nothing in the occupational therapist's testimony indicated a mechanism of injury that would cause a rotator cuff tear.

Petitioner's testimony did not alter his opinion. He thought Dr. Rosen's testimony demonstrated some confusion about which exercises petitioner performed on each of the three dates she participated in work conditioning therapy. For example, Dr. Rosen thought petitioner had lifted a bar on June 15, 2016. This was not the case, as testified to by the therapist and documented in her notes.

Dr. Levitsky further opined that in order to materially aggravate or exacerbate a pre-existent rotator cuff tear, one would still need an adequate mechanism of injury, which was not the case here. Further, to reach such a conclusion, one would have to seek comparative MRI studies, before and after the purported injury, to determine if a tear existed and was made materially worse.

Like Dr. Rosen, Dr. Levitsky could not say from his review of the MRI when the tear occurred. He pointed out, however, that the MRI of petitioner's shoulder also showed some degenerative changes, which were clearly pre-existing to her physical therapy.

During cross-examination, Dr. Levitsky agreed that merely having a rotator cuff tear is not enough to require surgery. Surgery would be required if a tear was accompanied by pain and interference with activities of daily living

11

and the condition was not getting better with time. Dr. Levitsky also agreed with Dr. Rosen that petitioner needs surgery to repair her torn rotator cuff, and he did not have any reason to believe she was a shoulder-surgery candidate before June 15, 2016, when she began her work conditioning therapy. According to Dr. Levitsky's report, petitioner's rotator cuff tear was likely asymptomatic before reporting shoulder pain to her treating physician the day after she began work conditioning therapy. Dr. Levitsky recommended three weeks of physical therapy and a cortisone injection as treatment for the torn rotator cuff.

## C.

In a written opinion, the JOC found petitioner had not proven her rotator cuff tear was caused or exacerbated by her work conditioning therapy. The JOC noted that at no time during petitioner's three work conditioning sessions did she complain of having suffered an injury to her left shoulder during therapy. This was corroborated by the daily activity logs completed by the therapist after each session. Moreover, when petitioner first saw her doctor about discomfort in her left shoulder, she did not state that she had suffered a traumatic accident which resulted in the injury. And though petitioner told Dr. Rosen she had injured her shoulder while lifting a bar and doing a swimming-type motion, petitioner's

12

therapist testified petitioner did not lift a bar during the initial work conditioning session on June 15, 2016.

The JOC found Dr. Levitsky's opinion credible, logical, and both medically and factually well supported. In contrast, the JOC found Dr. Rosen's testimony as to the cause of petitioner's rotator cuff tear to be speculative and without certainty. Consequently, the JOC determined petitioner had not sustained her burden of proving she had sustained a compensable accident.

## II.

On appeal, petitioner argues the JOC misapplied the burden of proof and misunderstood the standard for expert testimony. Petitioner asserts that when "it is claimed the accident was the result of the physical condition of the employee, the burden of proof is on the employer to show such cause." According to petitioner, respondent failed to demonstrate petitioner's injury was "idiopathic."

Petitioner points out that during cross-examination, Dr. Levitsky said he had no reason to doubt that her symptoms started on or about June 15, 2016. Moreover, Dr. Levitsky agreed petitioner required surgery to repair the rotator cuff tear and petitioner was not a surgical candidate before her first work

conditioning session on June 15, 2016. In his report, Dr. Levitsky recommended some treatment for petitioner's shoulder. Specifically, Dr. Levitsky wrote:

> If the examinee's history as presented to me is factually correct . . . I would recommend physical therapy for [three] weeks and a cortisone injection into the subacromial space for treatment as it relates to the reported physiotherapy incident. I would not indicate surgical treatment for repair of the rotator cuff tear as it relates to the reported June 16, 2016 injury as it is my opinion that this rotator cuff abnormality was pre-existing. Further treatment for the rotator cuff tear in my opinion would be appropriately pursued outside of her Worker's Compensation claim.

Petitioner construes this part of Dr. Levitsky's opinion as a concession that her shoulder injury was exacerbated by her physical therapy.

Petitioner also argues the JOC erred by rejecting the testimony of Dr. Rosen. Last, petitioner argues that the JOC's decision is not supported by credible evidence on the record.

Respondent counters that the JOC's decision is supported in its entirety by competent evidence, including lay and expert testimony. Respondent asserts the JOC properly found the testimony of both petitioner and her medical expert lacking in credibility. Consequently, the JOC properly concluded petitioner had not sustained her burden of proving each element of her claim.

A-5917-17T2

III.

A.

The Workers' Compensation Act (Act), N.J.S.A. 34:15-1 to -146, is "remedial social legislation that should be liberally construed in order that its beneficent purposes may be accomplished." Shaudys v. IMO Indus., Inc., 285 N.J. Super. 407, 410 (App. Div. 1995) (citing Fiore v. Consol. Freightways, 140 N.J. 452, 465 (1995)). It is an "axiomatic principle that the language of the [Act] must be liberally construed in favor of the claimant[.]" Close v. Kordulak Bros., 44 N.J. 589, 604 (1965).

The burden of proving that an accident is compensable "rests upon a workers' compensation claimant." Drake v. Essex Cty., 192 N.J. Super. 177, 179-80 (1983) (citing Mahoney v. Nitroform Co., 36 N.J. Super. 116, 125 (App. Div. 1955), rev'd on other grounds, 20 N.J. 449 (1956)). Under the Act, an injury is compensable if it "is caused to an employee by [an] accident arising out of and in the course of his employment[.]" N.J.S.A. 34:15-1. The phrase "arising out of" refers to the accident's "causal origin," and the phrase "course of employment" refers to the "time, place, and circumstances of the accident in relation to the employment." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 349 (App. Div. 1999) (quoting Shaudys, 285 N.J. Super. at 410).

The arising out of requirement "looks to a causal connection between the employment and the injury. It must be established that the work was at least a contributing cause of the injury and that the risk of the occurrence was reasonably incident to the employment." Coleman v. Cycle Transformer Corp., 105 N.J. 285, 290 (1986).

New Jersey uses "the 'but for' or positional-risk test" in "determining the requisite connection[.]" Ibid. "Essentially, that test asks 'whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere.'" Id. at 290-91 (quoting Howard v. Harwood's Rest. Co., 25 N.J. 72, 83 (1957)). "Unless it is more probable that the injury would not have occurred under the normal circumstances of everyday life outside of the employment, the necessary causal connection has not been established." Id. at 291.

> One of the components of the "but for" test is the nature of the risk that causes injury to the employee. Our courts have established three categories of risks. The first category includes risks "distinctly associated" with the employment, which are compensable. Examples of such injuries are industrial injuries resulting from machinery. The second category includes compensable "neutral" risks which do not originate in the employment environment but rather happen to befall the employee during the course of employment. The typical examples of neutral risks are acts of God, such as lightning. The third category of

risks includes those "personal" to the employee and are not compensable. In this category, the employment connection with the injury is minimal; it is the personal proclivities or contacts of the employee, not anything associated with the employment that gives rise to the injury. An epileptic seizure would be a classic example.

[Shaudys, 285 N.J. Super. at 411 (citations omitted).]

The third category of risks—personal proclivities or contacts of the employee that give rise to the injury—are often referred to as "idiopathic." George v. Great E. Food Prods., Inc., 44 N.J. 44, 45 (1965).

Risks that are personal to the claimant are defined as follows:

> If the time has come for the employee to die a natural death, or to expire from the effects of some disease or internal weakness of which he would as promptly have expired whether he had been working or not, the fact that his demise takes place in an employment setting rather than at home does not, of course, make the death compensable. Or if the employee has a mortal personal enemy who has sworn to seek him out wherever he may be, and if this enemy happens to find and murder the employee while the latter is at work, the employment cannot be said to have had any causal relation to his death. [1 Arthur] Larson, [Workmen's Compensation] § 7.20 (1990).]
>
> [Verge v. Cty. of Morris, 272 N.J. Super. 118, 127 (App. Div. 1994).]

A-5917-17T2

Another example of idiopathic injuries "are falls brought on by heart attacks[.]" Id. at 124. "The burden of proof to establish an idiopathic cause is placed on the employer." Id. at 128 (citing Spindler v. Universal Chain Corp., 11 N.J. 34, 38 (1952)). "To bar recovery, the record must substantiate a finding that the event was caused solely by disease or infirmity peculiar to the individual and not a condition of the employment." Id. at 124 (citing Spindler, 11 N.J. at 39).

Our review of the JOC's denial of petitioner's motion for temporary and medical benefits is limited "to whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge[ ] their credibility." Lindquist v. City of Jersey City Fire Dep't, 175 N.J. 244, 262 (2003) (quoting Close, 44 N.J. at 599). "We owe no particular deference to the [JOC's] interpretation of the law." Sexton v. Cty. of Cumberland, 404 N.J. Super 542, 548 (App. Div. 2009) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). If a JOC mistakenly applies the law to the facts, an appellate court "must grant appropriate relief." Ibid. (quoting Verge, 272 N.J. Super. at 123).

A-5917-17T2

B.

With these principles in mind, we first address petitioner's arguments that the JOC misapplied the burden of proof and misunderstood the legal standard for expert testimony. Petitioner contends the JOC should have considered the proofs under principles applicable to idiopathic injuries, which shift the burden of proof to respondent. We disagree. In our view, petitioner confuses those cases in which an employee's idiopathic condition causes a work accident or event that results in injury, with a work accident or event that aggravates a pre-existing condition or injury. Our cases make the distinction clear.

The Supreme Court's Spindler decision is illustrative. There, the employee, while operating a spooling machine, turned to replace a wrench on the tool shelf behind her when she slipped and fell on the concrete floor. 11 N.J. at 36. She was uncertain about what had caused her to fall, speculating a piece of wire may have been the cause. Id. at 37. Her employer argued "her injury probably resulted from dizziness or a fainting spell caused by a physical ailment rather than from any accident arising out of and in the course of her employment." Id. at 38. As the court noted, however, there was "no affirmative evidence in the record to support this supposition other than the answer to a hypothetical question asked of a physician produced by the employer." Ibid.

A-5917-17T2

The court explained that "[w]here it is claimed <u>the accident was the result of the physical condition of the employee</u>, 'the burden of proof is on the employer to show such cause.'" <u>Ibid.</u> (emphasis added) (quoting <u>Atchison v. Colgate & Co.</u>, 3 N.J. Misc. 451 (Sup. Ct.), <u>aff'd</u>, 102 N.J.L. 425 (E. & A. 1925)). The Court further explained:

> Here the fall resulting in the injury is not disputed. The difference of opinion centers in the cause.
>
> If it was occasioned by or was the result of a disease or physical seizure and was not contributed to by "what the workman had to do," it is not compensable. On the other hand, if the fall "would not have occurred but for the service rendered" in the employment, it is covered by the statute.
>
> [<u>Id.</u> at 39.]

The court concluded the accident was compensable. <u>Id.</u> at 39-40.

Similarly, in <u>Verge</u>, the dispute between the employer and employee was whether the permanent orthopedic injury petitioner suffered when she fell in the course of her employment was caused when her left foot slipped on a rug, or whether, as the employer claimed, her fall was an event not incident to employment but rather one that could have occurred anywhere at any time as one was walking normally. 272 N.J. Super. at 121-23. Reversing the dismissal

20

of petitioner's claim petition due to an inadequate record, we remanded the matter for further proceedings. Id. at 128-29. We explained:

> Petitioner need not show that the rug was defective or that she was free from fault. Respondent, however, cannot be denied the opportunity to prove by direct or circumstantial evidence that petitioner did not actually slip, but rather that her knee condition caused the event and therefore, her injury was caused solely because of her pre-existing or personal infirmity or condition. This is an issue which the judge could not resolve on the limited proofs permitted.
>
> . . . .
>
> The burden of proof to establish an idiopathic cause is placed on the employer.
>
> [Id. at 128.]

In the case before us, the parties' dispute does not focus on whether an accident or event that occurred in the course of petitioner's employment was caused, on one hand, by an idiopathic condition or disease of petitioner, or, on the other hand, by what the worker had to do. Rather, the dispute focused on whether petitioner's shoulder injury was occasioned or aggravated by her therapy, or whether it represented the progression of a pre-existing injury. Stated differently, the dispute was whether any event had occurred at work and caused or aggravated petitioner's injury. Consequently, the burden of proof did

A-5917-17T2

not shift to the employer and the JOC did not err by finding petitioner did not sustain her burden.

That leads us to petitioner's next argument: the court applied the wrong standard for evaluating expert testimony.  We disagree.  There was a factual dispute concerning the facts upon which petitioner's medical expert based his opinion.  Petitioner's therapist refuted by her testimony and by her contemporaneous records that petitioner was doing the exercises to which her medical expert attributed the onset or aggravation of her shoulder injury.  This foundation for her expert's testimony, as well as the difference in the opinions of the two medical experts, presented issues of credibility.  The JOC's credibility determinations, as well as his findings of fact, "could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility."  Lindquist, 175 N.J. at 262 (quoting Close, 44 N.J. at 599).

## IV.

Petitioner last argues that the JOC's findings of fact are not grounded in credible evidence, and his decision fails to sufficiently articulate the basis for the factual and medical findings underlying his opinion.  These arguments are

belied by the record. The judgment was based on findings of fact which were adequately supported by the evidence. R. 2:11-3(e)(1)(A). Petitioner's arguments to the contrary are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5917-17T2