**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1013-23

LEON BROOKS,

        Petitioner-Respondent/
        Cross-Appellant,

v.

RUTGERS, THE STATE
UNIVERSITY OF NEW JERSEY,

        Respondent-Appellant/
        Cross-Respondent.

_____

Argued March 12, 2025 – Decided August 7, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Division of Workers' Compensation, Department of Labor and Workforce Development, Claim Petition No. 2013-27948.

Jennifer A. Cottell argued the cause for appellant/cross-respondent (Capehart & Scatchard, PA, attorneys; John H. Geaney, of counsel; Liliya V. Bondarenko and Jennifer A. Cottell, on the briefs).

Allan L. Lockspeiser argued the cause for respondent/cross-appellant (Wysoker, Glassner,

Weingartner, Gonzalez & Lockspeiser, PA, attorneys; Allan L. Lockspeiser, on the brief).

Cheryl B. Kline, Deputy Attorney General, argued the cause for respondent Second Injury Fund (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Cheryl B. Kline, on the brief).

PER CURIAM

Appellant Rutgers, the State University of New Jersey, the former employer of petitioner Leon Brooks, appeals from the judge of workers' compensation's November 14, 2023 order after trial finding petitioner suffered a 74% partial permanent disability as a result of injuries incurred during his employment. Petitioner cross-appeals the order, claiming the judge erred in failing to find him 100% disabled. We have carefully reviewed the record in light of applicable legal principles, and we affirm.

I.

A. Testimony and Evidence at Trial

The trial spanned several days and included testimony from petitioner, treating doctors, and the parties' experts. Although the experts disagreed as to causation, the circumstances surrounding petitioner's impaired physical mobility and medical condition before and during his employment at Rutgers were largely undisputed.

Petitioner worked full time at Rutgers as a custodian between 2000 and 2013, when Rutgers terminated petitioner's employment, finding him physically unable to perform the duties of his position. Petitioner filed a claim with the Division of Workers' Compensation on October 9, 2013, alleging "[p]ulmonary, elbow[], back, hand[] and knee[]" impairment "[d]ue to arduous labor with standing and exposure to pulmonary irritants" on Rutgers's premises. The parties settled the pulmonary aspect of petitioner's claim in July 2020. On December 18, 2014, petitioner filed a Verified Petition against the Second Injury Fund alleging he was "totally and permanently disabled as a result of a combination of [his] pre-existing physical and/or psychiatric conditions and [his] last compensable injury or disease."[1]

Before commencing work at Rutgers in 2000, petitioner had previously received benefits through settlements for two workers' compensation claims: in 1995, for disability "for residuals of lumbosacral sprain with possible bulging discs" and in 1996 for "disability for the post-operative residuals of bilateral carpal tunnel release." He had prior surgeries on each knee decades earlier. Due

---

[1] "The Second Injury Fund . . . is a legislatively-created fund requiring contributions from workers' compensation insurance carriers and self-insured employers to absorb part of the impact upon employers of awards in certain cases involving permanent and total disability." Lewicki v. N.J. Art Foundry, 88 N.J. 75, 82-83 (1981).

A-1013-23

to learning disabilities, defendant was unable to read or write, and always worked physical jobs.

Petitioner passed the physical examination before starting his maintenance position at Rutgers. He explained in detail his daily job duties, which included "housekeeping," moving furniture, mopping floors, cleaning windows, shoveling snow, and unloading trailers. Petitioner testified he would scrub the showers and toilets, and mop, wax, and buff the floors, in eight different bathrooms, tasks that required him to bend repeatedly. He mopped the floors and scrubbed the toilets "every day." His back "was constantly in motion carrying, pulling, pushing, [and] moving."

Petitioner described bagging garbage daily, and hauling the heavy garbage bags down stairs and loading them into the dumpster. This required him to continually "bend" and "lift" to throw the bags into the dumpster. He performed this duty twice daily. Petitioner recounted times during the summer months when he was required to unload and move "a thousand" queen- and twin-sized mattresses, which were "very difficult" and "awkward" to grasp. The process involved "a lot of bending" and "a lot of lifting." He described the heavy tables he regularly carried as requiring two people to move.

Petitioner acknowledged his earlier surgeries, prior health issues, and

4

earlier workers' compensation awards, but testified that, after working for Rutgers, the condition of his knees, hands, and back continued to worsen. In 2004, he received benefits after a job-related accidental injury, explaining he slipped and fell, injuring his back. He described undergoing right knee surgery in 2006. Petitioner described himself "in pretty bad shape" by the time Rutgers terminated his employment. He recalled he "could[ not] stand long," and in later years, could not lift more than around thirty pounds, as recommended by his doctor, despite the job duties requiring him to lift heavier weight. He also testified his knee and back pain forced him to "call in sick" as he did not feel "a hundred percent." Petitioner indicated he also worked part-time at Retro Fitness between 2008 and 2011, but he explained those job responsibilities involved wiping equipment and did not require lifting.

Petitioner testified while still working at Rutgers he received "injections" which never fully alleviated his back pain. He ultimately underwent right knee replacement as "[t]hey could[ not] do [any] more steroid shots . . . [or] injections." He explained he suffers daily back pain, and his back locks causing "stab[bing]" pain impacting his ability to drive. His right knee swells, sometimes making it difficult to dress without assistance.

Petitioner explained he did not wish to give up his job, but Rutgers

A-1013-23

suggested "[a] [d]isability retirement," and eventually sent a letter of termination, explaining the decision to terminate was because he "could[ not] do it anymore." He recalled that he "had no income" and applied for a disability retirement pension and Social Security Disability, receiving both after being found totally disabled.

Rutgers presented testimony from multiple witnesses including David J. Lamb, M.D., who testified he examined petitioner in May 2004 for complaints of lower back pain and "paresthesia[]," or "numbness and tingling[] into his lower extremities and legs." Dr. Lamb testified he advised defendant that he "ha[d] degenerative bulging discs in his lumbar spine," and would have discussed "how [petitioner's] diagnosis might affect the performance of his job or his activities of daily living," including that "heavy lifting and bending and twisting could potentially re-injure or cause back pain or other injuries."

Accordingly, Dr. Lamb testified he "believed that [petitioner] could return to work in a modified duty capacity . . . . [b]ecause [he] was concerned that since [petitioner] was still in pain, [he] felt uncomfortable returning him back to work in a full-duty capacity." The doctor agreed "the nature of [petitioner's] job" and the accompanying job duties could "aggravate[ and] make worse[] his back problem." Nonetheless, Dr. Lamb testified "[t]here was no anatomic

6

structure to prevent him from returning to work."

Kenneth Chan, a physician's assistant in the Rutgers Occupational Health Department, assessed petitioner in 2005. Chan recounted his notes on petitioner's description of his injuries at the time, which included "worsening back pain" and his "report[ing] that his [eight] out of [ten] sharp, intermittent, nonradiating lower back pain associated with tingling to [the] left calf[ was] aggravated with sweeping, vacuuming, or stripping floor[s]."

Orthopedic surgeon, Gregory S. Gallick, M.D., testified that he treated petitioner after referrals by Rutgers Occupational Health. He examined petitioner in 2003 after his work-related slip-and-fall accident and recalled "his diagnosis at that point was a lumbar strain and contusion of his lumbar spine." In a subsequent visit, he found the injury "resolved." The doctor saw petitioner again in 2005, and, "understanding that [petitioner] did maintenance and heavy lifting in his job," told petitioner "if he d[id] lifting and maintenance for work, he may have back pain and he may want to look for an alternative job," but petitioner did not wish to change jobs. Dr. Gallick admitted in these evaluations he did not diagnose petitioner with "a herniated disc," "multiple levels of disc bulging," "lumbar degenerative disc disease," or "osteoarthritis."

Kenneth C. Peacock, M.D., testified for Rutgers as an expert in

7

orthopedics and orthopedic surgery. Dr. Peacock examined petitioner on June 22, 2015, and again on April 15, 2019, to "assess[] [p]etitioner's disability under the Workers' Compensation Statute."

He described that his examinations of petitioner revealed: limitation in his left hand and fingers; "diminished" grip strength on both hands; "bilateral carpal tunnel scars"; "tingling into the palms"; "positive provocative signs for nerve irritation"; "unstead[iness] on his feet"; "weakness with muscle testing in both lower extremities"; "bulging over the right lateral joint line in the right knee"; "diminished sensation with two-part discrimination testing of the right hand and the left hand"; "no effusion, synovitis, or crepitus in the elbows bilaterally"; and limited knee range of motion. In 2015, he found "lumbar spine degenerative arthritis, degenerative disc disease and disc herniation."

Dr. Peacock found no causal relationship between these injuries and petitioner's employment. He testified that he found no scientific support for the suggestion that petitioner's custodial work caused the knee, hand, or back problems about which petitioner complained. The doctor found risk factors, such as age, obesity, family history and "[p]revious trauma," such as prior surgery, present in petitioner's case that "outweigh[ed] the force and repetitive nature of . . . [p]etitioner's work."

8

Regarding petitioner's back, Dr. Peacock conceded that performance of job tasks similar to petitioner's can cause aggravation of existing injuries. However, Dr. Peacock indicated that to show petitioner's job duties worsened his condition, he would "have to show that his occupation would have increased that risk[, a]nd there's no medical literature that shows . . . that."  Dr. Peacock further opined physical activity "does[ not] necessarily lead to pathology," adding that "hav[ing] a job where you're more physically active will give you a healthier, . . . more robust physique."

Petitioner presented testimony from Morris Horwitz, M.D., as an expert in forensic medicine, which he defined as applying "medical science" in determining "causal relationship[s]" to injuries.  He opined forensic medical experts "would have a better idea of causal relation than a regular doctor."

Dr. Horwitz evaluated petitioner on four occasions dating back to prior disability claims before his employment at Rutgers, and he reviewed petitioner's medical history and records as well as his job responsibilities as a custodian at Rutgers.  Dr. Horwitz testified that, "within a reasonable degree of medical certainty," based on petitioner's complaints, his documented medical history, his demonstrated loss of function, and a "physiological understanding of [the] same trauma so involved," that petitioner's job duties at Rutgers between 2000 and

9

A-1013-23

2013 "were competent in producing causes of disability to . . . [p]etitioner, causing him to be permanently and totally disabled."

The doctor opined:

> [Petitioner's right] knee and . . . back were compromised and this basically caused more pressure, undue pain, and [decreased] ability to perform th[is] manual labor significantly, causing more stress and strain and compromise to both body parts. On a daily basis, there was no recovery period for this time. The traumatic events caused inflammation, edema, swelling, fibrous tissue replacing elastic tissue, causing a functional disability with restriction of motion, as well as causing the inability to do his work on a consistent basis.

The doctor first assessed petitioner at the time of his previous workers' compensation claims in 1995 and 1996. In 1996, he diagnosed petitioner with "bilateral carpal tunnel syndrome, . . . and residuals of strain to the right and left hands." He found a 30% disability in the right hand and 37.5% disability in the left hand. Thereafter, Dr. Horwitz examined petitioner in 2004 relating to his third workers' compensation claim and determined petitioner suffered 20% of total disability to his back.

Dr. Horwitz testified that petitioner underwent arthroscopic right knee surgery in 2006, including a "partial lateral meniscectomy"; and, while continuing to work post-surgery, petitioner continued treatment throughout his

10

employment. Dr. Horwitz explained that later MRI results between 2012 to 2013 for petitioner's back were "[a]bnormal," and showed "bulging and herniation with the approximation of the vertebrae then causing . . . him to have pain in the back." Epidural injections did not alleviate his back pain.

He evaluated petitioner again in 2014. The doctor characterized petitioner's disability as "[p]rogressive," explaining that it was not possible petitioner would improve. Dr. Horwitz memorialized his findings and conclusions in his 2014 evaluation report admitted into evidence. He opined, "[F]rom 2000 up until 2013, while in the course of his employment as a custodian he sustained occupational injuries to his right hand, left hand, back, right knee, and left knee." He specifically found petitioner's right and left hands and knees had swelling with abnormal ranges of motion. He found "loss of the normal lumbar orthotic curve and spasm were appreciated, objective. All ranges of motion were objective and abnormal."

Dr. Horwitz explained:

> I did come to a conclusion which was residuals of repetitive stress and strain to the right and left hand; disc bulging from L1 through S1; disc protrusion from L1 through L5; lumbar degenerative disc disease; residuals of repetitive stress and strain to lumbosacral region; status post right knee surgery; residuals of repetitive stress and strain to right and left knee.

11

I did come to a conclusion within a reasonable degree of medical certainty based on . . . [p]etitioner's subjective complaints being consistent with the loss of function with respect to the bodily parts so examined as well as review of the medical records and a physiologic understanding of the trauma so involved, I found that there was [a] causal relationship between the aforementioned diagnosis and the occupational injury sustained from 2000 up until 2013 and have objective medical findings noted . . . [showing] permanent impairment of [twenty-five] percent of the right and left hand, permanent impairment of [forty-seven] and a half percent of the right leg, permanent impairment of [thirty] percent of the left leg, and an orthopedic disability of [fifty] percent of total with respect to the lumbosacral spine. And I found that the patient was permanently and totally disabled by a combination of his entire medical conditions.

The doctor indicated he based his conclusions on "objective medical evidence of abnormality and disability" in petitioner.

Dr. Horwitz examined petitioner again in 2018 and explained petitioner's [r]ight knee total knee arthroplasty" in 2018 was "appropriate and necessary." He testified he found during that examination "more objective evidence of disability in the right knee in comparison to what [he] saw four years earlier." He revised his prior assessment of petitioner's disability to seventy percent of the right leg, but concluded petitioner "remained permanently and totally disabled overall by a combination of his entire medical conditions." He noted

12

the continued "stress and strain . . . aggravated and caused more and more deterioration, both in the back and to the [right] knee."

He acknowledged risk factors "predispose[] some people to knee osteoarthritis." However, the doctor explained he relied on petitioner's "history and [his] objective medical findings" to support his opinion that petitioner's condition was "causally related to his job duties."

B. The Compensation Judge's Decision

In her November 14, 2023 written decision, the compensation judge identified as the disputed issues "whether petitioner suffered a compensable occupational disease as defined by N.J.S.A. 34:15-31"; "what is the nature and extent of disability suffered by petitioner"; and to what extent is that disability "due to preexisting injuries/conditions."

Preliminarily, the judge found petitioner "was well spoken and very credible," offering "clear, credible, competent, and descriptive testimony of his condition before beginning work for Rutgers . . . and how his work duties specifically caused changes for the worse," additionally finding "[h]is testimony was believable and illustrative of the heavy and repetitive nature of his daily duties." She acknowledged petitioner "suffered several injuries before he started working for [Rutgers]," specifically recognizing his preexisting pain in his

"knees, back, and hands." The judge found significant that petitioner passed the pre-employment physical examination despite these ailments.

The judge noted that the only witness to testify about petitioner's job duties was petitioner himself; Rutgers offered no alternative account of his daily activities. She summarized the rigorous extent of his work that required petitioner to "constantly [be] on his feet, lifting, bending, squatting, [and] pushing," performing "daily work [that] was not easy or light." The judge recognized the work "was strenuous and constant" causing petitioner "increased pain in his knees, hands, and low back." The judge found Dr. Lamb and Dr. Gallick confirmed this finding, as Dr. Gallick "specifically noted [the] work require[d] heavy lifting which will cause back pain." The judge relied upon a Rutgers custodial work evaluation as identifying work duties "substantially like those described by" petitioner during his testimony. She specifically referenced the documented tasks as including:

> lifting 100 pounds maximum with []frequent lifting or carrying of objects; use of arms and hands "strenuously" examples given of mopping, sweeping, vacuuming, wiping, dusting[,] lifting garbage, snow shoveling and ice chopping seasonally; use of stairs "frequently"; standing/walking for long periods; sit[ting] for prolonged periods. Perform[ing] overhead work[] [with] examples given of wiping down mirror, cleaning overhead, using vacuum wand to vacuum overhead and cleaning showers; kneel[ing]/squat[ting]

14

to clean under toilets and sinks; work[ing] in "awkward positions/twist[ing]/bend[ing]/crawl[ing]" examples given of cleaning toilets in narrow toilet stalls, and vacuuming in and around furniture.

The judge noted "[v]oluminous medical records were admitted into evidence" documenting petitioner's need for "prescription medications to function during his tenure at Rutgers." She recognized Dr. Gallick's opinion that "the 'nature of [petitioner's] job' would cause back pain[,] . . . not[ing] that petitioner d[id] heavy lifting and maintenance work." The judge also acknowledged the records reflecting petitioner's "miss[ing] days from work because of back pain," and, starting on September 13, 2005, "his back pain was aggravated with sweeping, vacuuming or stripping floors."

The judge credited Dr. Horwitz's testimony that "while there is [a] natural progression of degeneration following an injury, that progression of degeneration can be accelerated by strenuous work," and found the doctor "specifically recognized that the type of work petitioner performed[,] physical labor with repetitive stress and strain[,] aggravated petitioner's preexisting hand[], back, and knee conditions as well as positive MRI findings of disc pathology at every level." She referenced Dr. Horwitz's pre-2000 examinations and 2018 examination and report reflecting his diagnoses of petitioner.

15

The judge reviewed Dr. Peacock's testimony, noting the doctor "declined to opine that . . . petitioner's work effort as a custodian at Rutger[]s caused any increase or aggravation to . . . petitioner's conditions," instead acknowledging "[t]he opinion was based on his research including that the[re] [wa]s no evidence that custodial duties in general lead to injury." Additionally, the judge found Dr. Peacock "attributed the cause of [petitioner's] injuries to [his] obesity, age, and family history," and recognized the doctor concluded "petitioner failed to show an objective worsening of the conditions of his hands and back," instead "attribut[ing] the cause of these disabilities to . . . petitioner['s] previous compensable incidents as well as the natural and expected aging process." The judge noted that "[w]hile Dr. Peacock testified at length concerning the various articles he reviewed and the job descriptions [contained] in them, it [wa]s apparent that he did not have a clear picture of . . . petitioner's day-to-day work duties."

The judge highlighted that Rutgers "on one hand insists that despite passing a prework physical and working for ten years, . . . petitioner's injuries prevent him from continuing to hold his job while simultaneously arguing that his job and the heavy repetitive nature of his daily work did not contribute to his increased disability," without presenting "evidence of any subsequent accidents

16

or injuries." After reviewing each remaining witness's testimony and acknowledging she "carefully consider[ed] all the evidence and testimony," the judge determined petitioner established the probability that the injuries stemmed from his "decade plus of service as a custodian for [Rutgers]."

The judge next summarized petitioner's injuries:

> Petitioner has constant pain in his back, legs, and hands. He cannot lift anything heavier than light groceries. His pain is worse in the winter. His back locks and jams. He cannot clean his own apartment and has a cousin who helps him. He has been unable to return to work and receives both [S]ocial [S]ecurity and an ordinary disability pension. His pension was awarded because of the same injuries (his back) that are part of this matter. Driving is difficult due to pain. My own observation of . . . petitioner during his testimony was that he was in pain as evidenced by his posture, constant wincing, shifting in his seat and general appearance of being uncomfortable due to pain.

The judge apportioned petitioner's injuries as follows:

> [P]etitioner has suffered disability of 74% of permanent partial total. Apportioned approximately 20% of the left hand for residuals of repetitive sprain and strain; 17.5% of the right hand for residuals of repetitive sprain and strain; 7.5% of the left leg for residuals of repetitive sprain and strain; 55% of the right leg for osteoarthritis and total knee replacement and 25% of the lumbar spine for residuals of repetitive sprain and strain; disc bulges at L1-12; L2-L3; L3-L4 and L5-S1; disc protrusions at L1-[L]2; L3-L4 and L5-S1 levels.

17

She further credited for preexisting injury 15% of both the right and left hands, 40% of the right leg, and 10% of partial total.

The accompanying November 14, 2023 order reflected the judge's finding of a permanent partial total disability. On November 21, 2023, the judge also dismissed petitioner's claim against the Second Injury Fund, finding "[p]etitioner is not totally and permanently disabled."

II.

On appeal, Rutgers argues the compensation judge erroneously found petitioner established that his employment caused his injuries. Rutgers contends that, unlike Dr. Peacock who "cite[d] medical data and refer[red] to a medical book that addressed petitioner's alleged occupational injuries," Dr. Horwitz's opinions amounted to net opinion without objective scientific support. It also contends the judge made insufficient credibility findings between the experts.

Petitioner cross-appeals, contending the compensation judge incorrectly determined he was not 100% disabled. He argues the testimony showed he "has significant and severe disability on a physical basis," "cannot read or write," and all the doctors concurred that he "is no longer able to work." Cross-respondent Second Injury Fund argues the judge correctly dismissed the claim against them, finding petitioner was only partially disabled. The Second Injury Fund

highlights only Dr. Horwitz found petitioner 100% disabled, whereas the others opined that petitioner could still work a less strenuous job.

The scope of our review is limited and well-established. Indeed, "[a]ppellate review of workers' compensation cases is 'limited to whether the findings made could have been reached on sufficient credible evidence present in the record . . . with due regard also to the agency's expertise[.]'" Hersh v. Cnty. of Morris, 217 N.J. 236, 242 (2014) (second alteration in original) (quoting Sager v. O.A. Peterson Constr., Co., 182 N.J. 156, 164 (2004)). "Deference must be accorded the factual findings and legal determinations made by the [j]udge of [c]ompensation unless they are 'manifestly unsupported by or inconsistent with competent relevant and reasonable credible evidence as to offend the interests of justice.'" Lindquist v. City of Jersey City Fire Dep't, 175 N.J. 244, 262 (2003) (quoting Perez v. Monmouth Cable Vision, 278 N.J. Super. 275, 282 (App. Div. 1994)). Our "deferential standard recognizes 'the compensation court's expertise and the valuable opportunity it has had in hearing live testimony.'" Ripp v. Cnty. of Hudson, 472 N.J. Super. 600, 606 (App. Div. 2022) (quoting Hager v. M&K Constr., 246 N.J. 1, 18 (2021)); see also Sager, 182 N.J. at 164.

"The New Jersey Workmen's Compensation Act [(WCA)], N.J.S.A.

34:15-1 to -14[7], is 'humane social legislation designed to place the cost of work-connected injury on the employer who may readily provide for it as an operating expense.'" Valdez v. Tri-State Furniture, 374 N.J. Super. 223, 232 (App. Div. 2005) (quoting Livingstone v. Abraham & Straus, Inc., 111 N.J. 89, 94-95 (1988)). The provisions of the WCA are "applied in light of this broad remedial objective" and "liberally construed in favor of employees to further its beneficent purpose." Ibid.

The WCA requires an employer to compensate an employee if that employee experiences "any compensable occupational disease arising out of and in the course of his employment." N.J.S.A. 34:15-30. "Compensable occupation disease" "include[s] all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment." N.J.S.A. 34:15-31. "[T]o receive an award for a compensable occupational disease, 'a petitioner must show that the alleged occupational exposure contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimus.'" Singletary v. Wawa, 406 N.J. Super. 558, 565 (App. Div. 2009) (quoting Peterson v. Hermann Forwarding Co., 267 N.J. Super. 493, 504 (App. Div. 1993)).

"[A] successful petitioner in workers' compensation generally must prove both legal and medical causation when those issues are contested." Lindquist, 175 N.J. at 259. "Medical causation means the injury is a physical or emotional consequence of work exposure . . . [and] proof of medical causation means proof that the disability was actually caused by the work-related event." Ibid. "Proof of legal causation means proof that the injury is work connected." Ibid. In making this assessment, "[i]t is sufficient . . . to prove that the exposure to a risk or danger in the workplace was in fact a contributing cause of the injury. That means proof that the work[-]related activities probably caused or contributed to the employee's disabling injury as a matter of medical fact." Ibid. Importantly, "[d]irect causation is not required; proof establishing that the exposure caused the activation, acceleration or exacerbation of disabling symptoms is sufficient." Ibid. The petitioner must "show by a preponderance of the evidence that the link is probable . . . [but] need not prove that the nexus between the [injury] and the place of employment is certain." Magaw v. Middletown Bd. of Educ., 323 N.J. Super. 1, 11 (App. Div. 1999).

Applying these principles to the record, we conclude the compensation judge did not misuse her discretion in finding petitioner met his burden of establishing a probability that he suffered a compensable occupational injury as

21

defined under N.J.S.A. 34:15-31. The judge exhaustively reviewed the evidence, finding petitioner's testimony about the nature of the work he performed and its impact on his physical condition particularly credible. Buttressed by Dr. Horwitz's testimony, petitioner's medical records, and to some extent the testimony of Rutgers's own witnesses, the judge's determination was sufficiently anchored in credible evidence in the record. The judge's determination did not rest impermissibly on petitioner's subjective complaints as Rutgers suggests.

Dr. Horwitz's opinions and the medical records and testimony clearly supported the compensation judge's finding that petitioner's condition worsened during and as a result of his thirteen years of arduous labor as a custodian at Rutgers. The judge accepted Dr. Horwitz's opinion that "while there is natural progression of degeneration following an injury, that progression of degeneration can be accelerated by strenuous work," and found Dr. Horwitz "specifically recognized that the type of work petitioner performed[,] physical labor with repetitive stress and strain[,] aggravated petitioner's preexisting hand[], back and knee conditions as well as positive MRI findings of disc pathology at every level."

By contrast, the judge found it "apparent" that "[w]hile Dr. Peacock

22

testified at length concerning the various articles he reviewed and the job descriptions described in them, . . . he did not have a clear picture of . . . petitioner's day-to-day work duties." We afford deference to the court's assessment of the experts, and are satisfied the judge supported her credibility findings with sufficient evidence in the record.

Rutgers argues Dr. Horwitz offered only impermissible net opinion unsupported by requisite facts or data. "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by the factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (alteration in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). The rule requires that an expert "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). Dr. Horwitz, board certified in forensic medicine, reviewed petitioner's records, examined petitioner several times over the duration of his injuries, reviewed his job requirements, and applied "a physiological understanding" to reach his opinions and conclusions. He explained thoroughly the reasons for his conclusions both in his reports and testimony. We conclude

23

the doctor's opinions were sufficiently supported and did not constitute net opinion.

Importantly, the judge did not rely exclusively on Dr. Horwitz. She greatly relied on petitioner and the medical evidence and records. She also cited to Dr. Gallick's opinion that the "'nature of [petitioner's] job' would cause back pain," and generally acknowledged that Dr. Gallick and Dr. Lamb both noted "[t]he difficulty of petitioner['s] work." Overall, the judge determined the objective medical evidence, as explained by Dr. Horwitz's testimony and gleaned from the medical reports and records, supported petitioner's claims and showed sufficient nexus to petitioner's employment. We are satisfied the records and testimony presented sufficient objective medical evidence to support the judge's determination of a disability restricting the function of petitioner's hands, knees, and back.

Rutgers claims that the absence of scientific studies to support the compensation judge's causation finding is fatal. We are mindful that generally "[t]he absence of any objective medical or scientific evidence establishing a causal link between [the] petitioner's place of employment and a claimed occupational disease will usually be fatal to the petitioner's workers' compensation case." Magaw, 323 N.J. Super. at 13. We have held that when,

24

an employee seeks to recover on an occupational disease because of exposure to the general environment to which the rest of the public is also exposed, the employee must present sufficient, credible, objective evidence that will raise the compensation court's determination from one of conjecture to one of cautious reasoned probability.

[Laffey v. City of Jersey City, 289 N.J. Super. 292, 308 (App. Div. 1996).]

This does not, however, require that scientific data be presented in every case.

Unlike cases in which injuries result from conditions "to which the rest of the public is also exposed," this case turned greatly on the work specifically performed by petitioner. See ibid. The judge credited petitioner's testimony regarding the nature of that physical labor and the evidence of his medical condition in its entirety and found those injuries sufficiently linked to the work he performed. Although Dr. Horwitz did not cite scientific studies, he provided an expert opinion based on his medical findings that the repeated physical stress inherent in the work petitioner performed for thirteen years contributed to the progressive degeneration of his medical condition. The judge's finding of the necessary causal connection was additionally supported by the testimony of the other medical witnesses, who in part warned petitioner risked worsening of his condition should he continue his custodial work without any modification.

Further, the compensation judge found inherent inconsistency in Rutgers's

25

position.  She emphasized that Rutgers once hired petitioner as qualified to perform the physically rigorous maintenance role after "passing a prework physical."  She noted, however, after thirteen years of petitioner's performing this work activity, Rutgers terminated him, finding he had physically deteriorated and could no longer perform those duties, but maintained that the job "did not contribute to his increased disability."  The court noted "[n]o evidence of any subsequent accidents or injuries" outside of work, and highlighted that Rutgers, not petitioner, prompted their "forced separation" by terminating him "due to his inability to perform [work duties] due to his injuries."  The court reasoned the record supported the conclusion that the rigorous repeated daily work exacerbated his condition to a compensable degree.  Accordingly, we will not disturb her finding of compensable occupational injury.

We likewise defer to the judge's determination of the degree of petitioner's disability.  See Perez v. Capitol Ornamental, Concrete Specialties, Inc., 288 N.J. Super. 359, 368 (App. Div. 1996) ("[W]e must defer to the judge of compensation's expertise in fixing percentages of disability . . . .").  The record was comprehensive and amply supported the judge's apportionment of petitioner's injuries, which she made in detail.  The experts varied as to

26

percentages and the judge made a determination in her judgment and experience. She made specific findings as to each condition, providing her reasons, and making appropriate credits and offsets. Based upon our careful review of the record, we defer to the judge's discretion in fashioning the award and discern no improper exercise of discretion.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

27